FILED 21 MAR '22 12:45 USDC-ORP

97315

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Portland _____ DIVISION

Sergio Miguel Zambrano
*(Enter full name of plaintiff)*

Plaintiff,

v.

Oregon Department of Corrections (ODOC)

~~[struck through]~~

~~[struck through]~~

*(Enter full name of ALL defendant(s))*

Defendant(s).

Civil Case No. ___ 2:22-cv-00443-JR
(to be assigned by Clerk's Office)

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (PRISONER COMPLAINT)**

Jury Trial Demanded

☒Yes          ☐No

## I. PARTIES

*List your name, address, and telephone number below, and the same information for each defendant. Make sure that the defendant(s) listed below are identical to those contained in the caption of the complaint. Attach additional sheets of paper if necessary.*

**Plaintiff**      Name: Sergio Miguel Zambrano

Street Address: 2500 Westgate

City, State & Zip Code: 97 801

Telephone No.: _____

Complaint for Violation of Civil Rights (Prisoner Complaint)     1
[Rev. 01/2018]

97315

DEFENDANTS: (Preliminary List — Attorney required to investigate)

- Oregon Department of Corrections, an agency of the state of Oregon
- Oregon Corrections Enterprises (OCE), a semi-independent state agency
- Paula Myers
- Nichole Brown
- ~~Settles~~ • Colette Peters
- Sue Washburn
- Brad Cain
- Tim Causey
- Josh Highberger
- Brandon Kelly
- Mike Bower
- Mark Neath
- Rob Persson
- Tyler Blewett
- Ken Jeske
- Lisa Emory
- David Pedro
- Ron Miles
- Nina Sobotta
- Ms. Murphy (Grievance processor)

II BASIS for JURISDICTION

A. Federal constitutional, statutory, or treaty rights at issue: (preliminary list)

1) Failure to protect — 42 USC § 1983 - 8th Amendment     (Assault, Covid

2) ADA - termination of work — 42 USC § 12133 and 12117   (OCE COVID termination)
   Equal Employment Opportunity Act  (Title VII)  (OCE Wrongful termination)
   Performance Rating Act of 1950  5:4303
   False claims — 31 USC § 3729

3) Federal Environment Pesticide Act  7:135
   Federal Hazardous Substance Act  15:1261

4) Fraud, Simulation of legal process, Deceit, Conspiracy

5) Prison Conditions

6) Federal Corrupt Practices Act  2:241 - 256
   Corrupt Organizations Act & Racketeer  18:1961 - 1968

7) Property Damage (Misrepresentation)

8) Aiders/abettors of Conspiracy — § 1986  (42 USC)


B. This suit is being brought against STATE or local OFFICIALS  (a § 1983 claim)


Complaint... Page 3

III  STATEMENT OF CLAIMS

For all claims in this suit, all The superiors of the staff mentioned in each claim up to the top of the ODOC itself and the IG, were responsible for eachother's actions because petitioner made sure to contact them all, and made them aware of what their subordinates were doing and what wrong, deprivation of privilege or right, health risk/damage were involved, and all of them chose some or all of these:

a) Refused to even respond Kytes (obviously not to contradict or lie)

b) Misleading, misdirecting, feigning confusion or unawareness, perpetuating indifference

c) Covering up for co-workers, employer or DOC

d) Colluding to match/align stories to perpetuate unawareness, misinterpretation, etc.

e) Keeping my complaints off the record so reviews show nothing wrong

CLAIM I: COVID-19 and Termination of job, because of it.

I.1) Petitioner was fired as soon as OCE's Mr. Overstreet was told, by petitioner, that he was sick, after only nine days of calling practice. Not long enough to possibly conclude "low production"

I.2) Petitioner got his (first) COVID-19 from OCE's visiting Clients, Advance Brands'.

I.3) Mr. Overstreet knew or should have known about the health status of his visiting Client's members before letting them sitting next to his employees, like petitioner.

I.4) Despite petitioner good work statistics, with only one immediately-corrected lower-than-ideal factor (Call Disposition — more details below), Mr. Overstreet blamed Advance Brands (AB) for the termination. (See unlikely of this below in point #9)

I.5) Petitioner grievances about the termination were denied as untimely, without exception for his officially diagnosed severe sick condition, even prohibited from even mentioning it in related grievances. (Grievance System abused and disabled as described in claim XII)

I.6) Petitioner multiple informal requests for explanations and contact information / mediation for / with AB were either refused, ignored, [fake] "missed" and even covered up, from the grievance team all the way up to the I.G.

I.7) OCE and EDCI had the power and the knowledge to move inmates away from sick inmates, yet chose to only do it when convenient for their business. For example: I was unrequestedly moved AWAY from newly-arrived Call Center employees to ensure their good health. Those bunks located at the end of the unit, get the freshest air, without everyone else's sneeze and coughing (microbes) that is mostly breathed by those closer to the air-return vents.

I.8) STATUTE OF LIMITATIONS:    (I8.b after I14)

OCE's and EDCI's staff, plus Law Library's pro-institution biased legal advice, delayed petitioner awareness of the wrongness of these acts and the roles and rights governing them, only advising the negative side of it, or withholding materials (see claim III(b) and III(c), some of which I only got through endless digging AFTER they felt safe (unreachable), e.g. EXHIBIT I1.a, or from the State Legal Library because EDCI's just don't have it (or so they say), like EXHIBIT I1.c.; the first responded on

e.g. Exh. I.1b

1-26-22 but withheld until 2-7-22, exactly two years of the termination, the ~~this~~ latter not earlier than 9-21-21. This confirms any suspicion that their "failure" to send/provide those are planned, to hamper/sabotage legal actions.

Because of these reasons, and points 5 and 6, Petitioner requests equitable tolling of the statute of limitations for all claims related to his imprisonment. (more I.8.b. after I.14)

I.9) Chances/Likelihood of the party terminating my employment being Advance Brands: Very unlikely. Specially if "~~for~~ low production" because of ; because:

I.9.a) When interviewed for the job, I TOLD Mr. Overstreet, and he still hired me, that:

I.9.a.1) My accent makes people hesitant to trust me, open up, for a visit to their offices or to volunteer information, this last being the MAIN purpose of AB's business.

I.9.a.2) I didn't care about bonuses (leads)

I.9.b) AB had no interest on "low production" OF LEADS. Leads was Overstreet's (OCE) business. AB cared, measured and tracked "calls per day", data mining, data precision, and trained us on the means to accomplish those.

I.9.c) AB's own training materials clearly state callers' pay come from "updating databases", which makes more unlikely or even unfair to be fired for something is not even my job (and even accepted to be low since interviewed — see 9.a)

this separation of goals is so by design, to prevent harassed Contacts from showing AB ~~aware~~ aware of their callers lying or breaking privacy rules to get bonuses.

I.9.d) I was shown AB stats a few times, and the only thing I rated a little low on, I dramatically reverted it when my trainer explained how they wanted me to disposition most calls, against the obvious (i.e. so the Contacts are called more often). the obvious being that, as some contacts complained, nobody wants to be called four times a day.

I.9.e) I personally spoke with AB team, as well as sent often feedback online, and they always were thankful of my eagerness to improve myself and their system, and encouraged me to continue, including my professional webmaster feedback.

I.9.?) We were not even trained to get leads: the best caller of all, ~~Travis Miller~~ sitting behind me, getting 30+ leads a day, admitted "if you follow the script they gave you, they'll hang up on you". This, put together with our bosses promoting our calling the same contact four times a day, makes obvious that the leads are obtained AS A TEAM. The less charismatic ones, eg. me, are as important as the "top seller" ones, to make the contact GLAD to accept the charismatic ones' deal, whatever it is as long as it makes them all stop calling. Because of this too, it's unlikely, and it'd be wrong, to terminate anyone, charismatic or not, after only nine days of calling.

I.10) It's also fair Mr. Overstreet, not AB, compensate me because he did not reciprocated the six-months commitment he asked us all when hired: He fired me after nine days of calling, while others have taken as much as three months (that I know) to get the leads OCE calls "average". (~~illegible struck-through text~~)

I.11) If a minimum of leads were mandatory, it'd be in our contract, and these would not be called "bonus".

I.12) EXHAUSTION:

Although this was only my second grievance at EOCI, it really shouldn't matter wether I knew already back then that the grievance system was available or just a manipulable tool to perpetuate staff's abuse. It should only matter that I can prove it's never been what it should have, or at least now (or as long as the same current staff was in charge of it), and this suit's claim XII does exactly that.

Yet, I still tried to get my unfair termination, the wrongs to accomplish it, or the refusal to answer, accepted in a grievance (the only way to reverse-engineer constant opposition inconsistent with rules), so here is a list of my attempts to solve these wrongs before this suit: 29 Kytes to EOCI's Overstreet and Grievance team or superintendent, 3 to OCE salem (Bartholomew), 1 to I.G., 15 to meet (sup or GC)

Complaint too    page 7

as well as four attempts to grieve the whole issue or its parts, from which only one was accepted (the refusal to answer one, but not the others, Kyle), AND appealed. Grievances #S: #EOCI-2020-04-127, 05-056, 05-078, and 06-090.

I.13) RELIEF (termination only)

As a start, before an actual attorney or petitioner finishes or amends this initial suit with properly calculated and updated numbers, petitioner demands the money he would have earned at the Call Center, plus EOCI's matching amount, at most until today, because he's a very stable proactive perfectionist worker who enjoys to work and improve it, and at least until October 2021 because had he ever got himself tired and quit, petitioner would have done only AFTER getting his second IRS stimulus payment, which he got on 9-15-2021.

I.14) Caselaw and authority and responsibilities will have to be re-researched in part because of EOCI's staff retaliation for petitioner's grievances, by sabotaging/destroying his legal research and documents from his removable FLASH DRIVE, described in Claim III a; and in part because the legitimate and abused limitations of the law library because COVID-19 operations.

I.8.b) Another type of ~~refusal to~~ attempt to cover up my COVID, and refusal to do anything that would give me proofs of it, is doctors refusal to test me for COVID-19 antibodies, not even by charging me for it, which I asked and they refused on 2-  -2022 (EXHIBIT    ), or refusing to provide any solution for my COVID not being in my record (will cause segregation, work discrimination, health benefits/privileges, etc.) [loss of]

Complaint two    page 8

CLAIM I.B: COVID-19 Negligence.

Since petitioner got COVID-19 three times, and because OCE was only involved in the first, this claim is placed here to keep them organized and to address EOCI NEGLIGENCE: ODOC knew or should have known that its employees, agents and visits or partners (or whatever kind OCE client Advance Brands were let in as) were not observing social distancing, wearing masks, or otherwise protecting against the spread of COVID-19 and that this presented a significant risk of infecting prisoners such as the plaintiff.

ODOC knew or should have known that placing covid-infected prisoners in cells, units or dormitories with uninfected prisoners presented a significant risk of infecting prisoners such as plaintiff. ODOC knew or should have known that forcing covid-infected prisoners to work alongside of, or in the same space as, uninfected prisoners presented a significant risk of infecting prisoners such as plaintiff. ODOC knew or should have known that failing to protect plaintiff would result in his suffering physical harm and severe physical and mental pain and suffering. Because ODOC's failure to protect him, plaintiff suffered physical harm and severe physical and mental pain and suffering.

ODOC owes plaintiff a higher standard of care because of the nature of incarceration. As wards of the State, ODOC manages all aspects of plaintiff's life and decides with whom inmates will interact, where they will work, live, sleep, bathe, use the toilet, recreate, etc. Had plaintiff been a free person, he'd have been able to abide by social distancing, mask wearing, personal hygiene, and other obvious methods of protecting himself and his immunity (eg by avoiding foods and chemicals known to lower the immune system and its resistance to viruses such as covid-19 with it — eg. see claim VI.3, VII.1) However, as prisoner, plaintiff was prevented by ODOC from being able to take these measures, as well as other multiple steps the FDA, Health Department and Medical Association have not issued official rulings for, assuming the free person can just find it out

Complaint... page 9

by themselves (eg. Googling it), like natural or cheaper or even more effective or safer, used by first-world countries with no ties to pharmaceutical Companies, as extensively exposed by Marcia Lovel, former editor in chief of The New England Journal of Medicine.

ODOC voluntarily took custody of plaintiff and deprived him of normal, and even better-than-official opportunities for protection; this created a non-delegable duty to ensure that plaintiff is safe from COVID-19 while incarcerated. Defendant failed to meet their obligation to protect prisoners from known, obvious and predictable threats to their health and safety.

ODOC's conduct was unreasonable in light of the risk of harm to plaintiff. Plaintiff's contracting COVID-19 loss could have easily been prevented by not taking pointlessly dangerous, affirmative steps that placed plaintiff's life at risk. Instead, ODOC staff took affirmative steps to endanger the plaintiff, such as stated above and in plaintiff's declarations in support of this claim and VI 3's, VII 1's, II. 1

CLAIM I.C: Failure to Protect

42 USC § 1983 - 8ᵗʰ Amendment - Failure to Protect Petitioner from COVID-19, against defendants Myers, Brown, Peters, Washburn, Cain, Causey, Highberger, Kelly, Gower, Neoth, Perssen, Blewett, Jeske, Emery, Pedro, Miles, Sobotta

Defendants named above were deliberately indifferent to plaintiff's safety by doing the following:

a) Calling to work to prisoners that were housed in quarentined units (with COVID-19 positive prisoners), as well as making them eat, serve food, and otherwise interact in person with prisoners from non-quarentine units; or letting them do so.

b) Placing prisoners that were symptomatic or who had tested positive for COVID in confined spaces, such as cells, workspaces, and transportation vehicles, with prisoners that had been infected with COVID-19.

c) Allowing Corrections staff with known COVID-19 symptoms to work in the institution

d) Allowing Corrections staff to interact with prisoners without PPE such as gloves, etc.

e) Failing to sanitize commonly touched surfaces such as telephones, tablets, and door handles;

f) Failing to screen Corrections Staff for COVID-19 symptoms or fever;

g) Failing to socially distance prisoners and staff

h) Failing to address the quadrupled workload at the scullery due to the COVID operations making diners use twice as many food trays (one as cover) to take the food "home", soiled on BOTH sides b/c they are piled up for transport.

i) Allowing quarentined-units ~~workers~~ kitchen workers to handle food only because they are vaccinated.

j) Failing to open TV rooms or extra (empty) education rooms for inmates to eat or to do legal work

k) Failing to check inmates' temperature mandatorily, at least for those STILL going to
   Complaint ••• page 11

activities or yard to sweat (some despite sick! believing it'd heal them!) together or
increasing their infectiousness.

L) Failing to move inmates refusing to be tested downwind, unit's fresh airflow wise, to
allow healthy responsible ones llve upwind from the sick/suspected/irresponsible ones (so
all the coughing/sneezing ~~those~~ only passes through them and not the healthy ones).

m) Failing to allow and provide a discrete way for a higher amount of volunteers for tes-
ting, to avoid their being bullied/harrassed/retaliated for putting the ~~whole~~ unit on quar-
antine (testing was offered, but at the earliest time of the day, when most are asleep,
and in the most loud undiscrete ways, and only when the unit was already·quarantined —
each newly infected was listed for extending the quarantine) obviously designed to discour-
age, rather than encourage, testings)

n) Forcing negative inmates at the quarantine unit, where COVID-positive and covid-negative
inmates where housed ~~when~~ infected/apparently ~~suspected~~ for show, to clean cells left by positive in-
mates transported to the hospital or worse, no gloves provided (see details on declaration
in support of this claim)

o) Simulate precautions when real measures were ordered (eg by court): Wall-Cleaning
and enough time for quarantined inmates' exhaled air to clear from dining room be-
fore letting in the next unit, or before workers to clean the steamline, and other
obviously-for-show prevention measures, are only done once or twice a week, ne-
ver for breakfast. Probably enough for some surveillance video to be collected for
show.

As a result of their deliberate indifference, defendants violated plaintiff's right to be
free from cruel and unusual punishment under the Eight Amendment of the United States
Constitution. Defendants' failure to protect plaintiff from COVID-19 infection resulted
in permanent physical and emotional harm. Plaintiff will require future treatment be-

Complaint ooo page 12

cause of defendants' indifference.

Defendants' conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of plaintiff. As such, plaintiff seeks punitive damages in an amount determined by a jury at the time of trial.

As a result of the defendants' violations of plaintiff's Constitutional rights, plaintiff suffered physical harm and severe physical and mental pain and suffering. Accordingly, plaintiff ~~are~~ is entitled to economic and non-economic damages against defendants in an amount to be determined at trial for the violations of 42 USC § 1983 and for plaintiff's attorney fees and costs pursuant to 42 USC § 1988.


PHYSICAL DAMAGES AND LOSS DUE TO COVID-19

Due to COVID-19, Petitioner suffered: Nausea, loss of apetite, Fever with delirious nights, general body pain on skin and muscles, chest pains, throat pain, loss of sense of taste, including PERMANENT ability to detect or sense faint rottening and spoilng smells, vital for preventing eating and staying away from dirty or old food or food-stained clothes/utensils. For example: petitioner was able to smell the beard's food particles, dirty clothes from body odor or food, when the face mask (through which he breathes the bacteria in it into his lungs) needed to be washed, when his water cup was moldy, or when his or others' saliva was on cups or forks, or in the air (eg. others' sneeze), or when his saliva or breath was bad.

Petitioner also got depressed, suffered loss of interests on learning new things, like reading physics books or other educational texts, even dropped his music program because of that loss of interest/motivation. This also affected his ability to keep up with the kind of readings necessary for his legal cases. Plaintiff blacked out one night and laid on the floor for several minutes. Breathing tests reveal "high CO" he never had before.

Complaint 000    page 13

CLAIM II : Daily DIRTY FOOD and Plastic Ware

II 1) Failure to comply with food and public health regulation   (lost research b/c Claim III h)
by washing too many food trays manually, especially now that inmates use twice as many
because of their taking the food to their cells/dormitories, twice as dirty because they
are stacked up to be returned to the scullery, soiling not only the top but also the bot-
tom with grease-trapped saliva and pathogens. An automated dishwashing machine is requi-
red above 200 trays. Currently only the first 50 or less might be clean (if the other
failures were also fixed) but even those few get cross-contaminated when improperly handled
by stubborn orders, eg to ~~hand~~ "hand them", which makes one same worker touch ALL
the trays (see declaration in support for details), and a greasy tray is NOT clean.

II 1.a) OAR 291-061-0010 (4) defines "clean" (or "sanitary") as: "free from pollution, de-
predation, micro-organisms, flies, roaches, rodents, other vermin, dust, soil, filth, leak-
age, or other contamination". Saliva and COVID-19 trapped inside fats (butter, oil, meat
fat) are not reached by the disinfectant. Fats should be eliminated BEFORE the last sani-
tizing step, and the fact that almost every tray handed to inmates is greasy somewhere
means that the sanitizer is wasted and not being effective, thus the tray still dirty, con-
taminated.

II 1.b) Defendants and their staff were warned multiple times of these facts personally or
through mostly-never-returned kytes, but chose to make us ~~to~~ follow defective or inef-
fective orders even after they were made aware of it, confirming the feigned or "for-show"
quality of defendants' "care" about petitioner's health.

II 1c) One correction staff, Officer Pullen, even yelled Plaintiff "stupid" (no reprimand
issued because the grievance's reviewer decided the plaintiff deserved it for [assumed
constantly] suggesting better ways to do things) for following to the letter one of those
capricious orders: Pullen wanted tables "sprayed", which only 5% or less of their

Complaint ...   Page 14

surface and NOT wiped (100%), ordering plaintiff to WAIT until everyone left the di-
ning room, as if plaintiff wanted to spray, which plaintiff clarified but Pullen switched
to "while" the food" is in the room" (a 6,000 ft² room) to perpetuate the obedience
demands. This is a clear example of the abuse of power used to prioritize personal gra-
tification (it was Pullen's last day as my coordinator and obviously wanted to get back
to me for all those times I provided "bodily fluids cleanup" advice, or simply pointed
the obvious, advice I have diploma for), pride, obedience, cover-up for co-workers,
over reason, sense, care and safety.

II 2) Dirt in Grilled foods:

Prisoners at EOCI such as ~~peti~~ plaintiff are fed dirty food everyday from Grilled foods because defendants fail to control and ensure proper cleanup and rinsing of the flat grills, failure which allows metal shavings/dust from the poorly rinsed/wiped grill's surface, gaps between surface and walls, the cleaning pad, and previously burned food.

II 2.a) Grill shavings are inorganic metals and as such not assimilable by the body without chelating agents missing from diet and refused by prison doctors as "preventive" care (claim IV 5). These metals include Nickel, Chromium.

II 2.b) Grills are cleaned by abrasion rather than through less residual methods (like light vinegar or steam) and the cooking oil/margarine pulls out those shavings from the corners and gaps between metal plates, during cooking.

II 2.c) Food Services and Health Services have been alerted of these dangers, with details of the danger and health damage, in person and in written. Yet fried eggs, the food that makes easier to spot the gray dust on the whites, keep being served dirty every day. Kytes doing so were not responded. Sent to Ms. Emory, Servi, Capt. Tagney, Gift.

II 2.e) Nickel is especially detrimental to health: It's ONLY through nickel that fungus and other soil-born/dwelling pathogens can create nitrogen-rich ammonia that damages the liver and feeds other pathogens that should NOT multiply inside the body but be killed by white cells (~~some~~ disabled by red dye #40 in jello - claim VI 3) or in the constantly burdened liver.

II 2f) The only sensible response from staff has come from ~~M~~ Food Coordinator Griner but still not addressing the main issue: frequency: the human body is resistent but as long as it has a break from pollutants, so his excuse of "the cleaning pad is food-grade" only means that it won't "poison" us in the short term,

but even food-grade additives are not suppressed to be eaten daily (called "pollution" and not specifically addressed for every chemical by FDA because it's assumed people can google it and opt out, unlike prisoners like plaintiff). Neither does Griner's answer address anything but the cleaning pad/brick.

CLAIM III

Pattern of sabotage /interference with legal work, either as collusion to hamper or as retaliation for using the legal system. For example:

III 1) Digital Legal Files/Documents EDITED, some CONFIDENTIAL because of being search results and legal work AGAINST prison, i.e. the defendant TAMPERING, not only seeing legal work of the party suing them.

III 2) Legal Assistants not properly trained or forced to hold back accrued experience

III 3) Coordinator of Law Library interfering with /deciding what AICs file or not.

III 4) Coordinator of L.L. perpetuating [fake] unawareness to refuse services and supplies

III 5) L.L. Coord. Helps Public Defender against inmates' will (e.g. through undisclosed calls with AIC's attorney)

III 6) L. Library keeps copies of AICs' prints / copies (some confidential because (1))

III 7) Asking AICs for pre-signed blank CD-28 (payment authorization forms) exploited to cement unauthorized charges, prevent/hamper complaints.

III 8) Destroyed Legal digital documents, staging accident, as retaliation for using the legal system (eg. two days after grievance), before they were transmitted to Courts /advocates

III 9) Helping /Covering up legal mail to get "lost" (SRCI-EOCI)

CLAIM IV

MEDICAL/DENTAL indifference

In general, doctors omit, refuse to acknowledge, misrepresent, "forget" to log symptoms, etc. to refuse Level-2 Care, only willing to ~~treat~~ give post-damage care.

IV 1) Refusal to record/diagnose life-threatening impairment to shiver diaphragm's

IV 2) Refusal to apply dental filling without chemical-leaching primer in low-stress zones.

IV 4) Failure/refusal to enter in inmate's "400" (security system) medical facts only doctors can/should verify/confirm for other staff, e.g. Security, accommodate for individual or institution-wide needs; including other tasks not necessarily "treating" which only doctors can/should do; e.g. Confirm lack of nutrients in food (e.g. 5.2), or metals in food (e.g. 2b)

IV 3) Refusal to provide qualified eye doctor to evaluate chemical accident at work for months, and when one did (non-just-optometrist), still not experienced or even knowing about the way the chemical works when absorbed through the skin*, he was NOT provided the SDS for the chemicals possibly spilling into my eyes. (* stated in labels)

IV 5) Failure/refusal to recommend, even acknowledge, obvious/known, long-term consequences/damage from standard food/conditions, e.g. 5.2, 6.2, 6.3.

IV 6) Refuse to correct officials responding us to use baking soda in written. (too abrasive)


CLAIM V

FOOD [lack of] NUTRITION

V 1) Refusal to provide food alternative to Milk I'm allergic to (Milk is THE one food inmates are supposed to rely on to obtain our Calcium)

V 2) Refusal to provide Magnesium, KNOWN to be missing from our diet, BEFORE any of the KNOWN multiple commonly misdiagnosed conditions its lack causes develops (in other words, doctors want to WAIT until a serious condition ~~develops~~ - probably irreversible - develops)

Complaint... page 19

CLAIM VI

FOOD: Dangerous or unable to opt. out without opting out meat.

VI 1) Daily inorganic metals in unpeeled potatos' skin DIRT (see 2.c)

VI 2) Dependency-creating spicy ingredients in MAIN meal (i.e. damages the same sense that estimulates) + flares out hemorroid. (it's not even "flavor" but inflamation, increasing over-eating)

VI 3) Jello/Jelly is ALWAYS red (Red 40), even purple "grape". No break for white cells, especially important during COVID-19 epidemy. Banned in 1st world countries.

VI 4) food, specialty meats, below safe temperature


CLAIM VII

CHEMICALS: Exposure to, unable to opt. out in most cases. (e.g. still inhaled from others' 8-15 gallons/week sprayed in the room) (eight to fifteen)

VII 1) "710" is "absorbed through the skin". Labeled as "pesticide" is adviced/ordered by Admins for against-label uses, most times unlabeled. NO SDS shared with the actual user (the inmate)

VII 2) Other uses are perpetuated by the selling of "hairspray" which NOBODY uses for real: Canteen knows the ~~bottle~~ spray bottles are sold to SPRAY "710", shampoo, conditioner, and other chemicals NOT designed to be fully atomized/inhaled.

VII 3) No fluoride-less ~~toothpaste~~ option for toothpaste is provided or sold. Staff responds with "use ~~baking~~ soda" but dentist recomends against — NOT in written, though. (see 4.e)

VII 4) Refusal to provide SDS to actual users, even after accident, and charging and ~~inreal~~ price as deterrent as if "public record" (they are not).

CLAIM VIII

FAILURE/REFUSAL to accommodate for physical differences (pattern of act-
ions/inaction indicates reason to be "to prevent others asking for it too")

VIII a) Functional clothes for short/slim inmates, and refusal to make/allow modi-
fications, to prevent accidents or allow basic activities like reading.

VIII b) Toothbrushing at work (BEFORE the acid damage happens, before the thick-
ness of the plaque requires 10x more brushing/wear)

VIII c) Sweatshirt at work — or stopping high-ranking officials from keeping doors OPEN
in winter — needed b/c my diafragm's unability to shiver (what prevents hipothermia)


CLAIM IX

Campaign of Harassment/Intimidation/Coverups

IX a) Retaliating bunk move/placement with dangerous inmates, plus refusal to move
me AFTER one of my reported risks materialized into physical assault.

IX b) Priorizing officers safety over mine: Lack of discretion (maybe even intended dis-
closure) about my REPORTS; insulating/protecting violent inmates by interlacing
pacifist ones like me)

IX c) Using position's power (immunity against grievances), by grievance processor, to
avoid consequences to her or boss

IX d) Security Staff threated me with DR if I "keep kyting the Dentist"

IX e) Security staff ordering me things they rarely do to others (e.g. talking with
other inmates waiting in line b/c I grieved them or b/c I talk legal things)

IX f) Stonewalling to reach Superintendent

IX g) staff cover for co-workers against rules requiring to REPORT it, and failing to
elevate issues ENSURING/COLLUDING for issues fall in designed LIMBOS.

IX h) Guards wrote "RRR" in my cell's glass (Rapist, Rat, R     )

IX i) Sexual verbal harrassment while just beaten-up, in pain, cuffed up to the wall, na-ked, and later failure/misdirection/refusal to investigate, plus cover-up.

IX j) Staff using ODOC records/system for illegitimate purposes (libel/slander/retaliation) [c3]

## CLAIM X

Refusal to authorize group to share legal experiences and provide help of com-monly used "unawareness" and tricks to hamper ~~Admin~~ grievances and other re-quests to Admins, obviously not obtained, even sabotaged, at the Law Library, e.g. 3.d.

## CLAIM XI

GENERAL LOOPHOLES and abuses of ODOC rules through operational [directives?]

XI a) CD-28 pre-signed scam cements unauthorized charges (e.g. 3.g)

XI a.1) Photocopies (facilitates retaliation)

XI a.2) Canteen missing/misdescribed/deffective items

XI.b)

## CLAIM XII

DUE PROCESS/DISCRIMINATION: Grievance process deliberately turned unavailable 25 Grievances plus "corrections"/resubmissions, from which I collected 90+ abuses indicating ANY issue, even those accepted and resolved, can be denied or otherwise sabotaged, using the SAME tricks used on mine.

CLAIM XIII: PHYSICAL ASSAULTS

Failure to Protect: Plaintiff was assaulted twice. One at SRCI right when he needed to be working on his pro-se supplemental brief (direct appeal), the second at EOCI while he was asking questions about the assault.

XIII 1) It's highly likely plaintiff's first assault was directed by SRCI's officials, considering:

a) Its timing, matching plaintiff's need for the Law Library and filing his appeal's pro-se brief

b) the staff who had recently interviewed plaintiff to "deal" with [the problem] his grievances, Mr. Marharsi, has a record of doing exactly that: arranging inmates assaulting inmates (legal case needs to be re-found: Lost in Flash Drive Sabotage in Claim III h)

c) None of the referrals Marharsi did for Plaintiff go and try/talk with solved anything or caused anyone do anything different than they were doing, meaning Mr. Marharsi did nothing but pretend caring while sizing up plaintiff's legal knowledge (threat), considering options: intimidating? retaliating.

d) Every staff and inmate knows that Snake River is the wrong prison to send a pacifist not gangster inmate to. The interviewer at Coffee Creek knew it or should have known, also, from my making clear I don't even have the reflexes to run or protect myself from aggression. Even plaintiff's trial attorney Hanrahan KNEW this and admitted it to plaintiff's appellate attorney. The knowledge above includes that, in the case of sex offenders, inmates at SRCI DO attack unknown random sex offenders only to gain reputation, to "fit", which those at EOCI don't do. (Exhibit XIII 1.d)

e) Considering that sex offenders are not sent to EOCI unless they are beaten up, (statistics might not show this if records are tailored as mine did) it makes sense SRCI officials, or just Marharsi, "helped" plaintiff qualify to live at EOCI (by doing him the "favor" of arranging his getting assaulted) where he should have been housed from the beginning.

f) Helping solidify the theory of retaliation and harrassment, the Staff at he law-library at SRCI DID take advantage of plaintiff's segregation after the assault for about two months (to hide him from witnesses of his injuries) to limit and even sabotage plaintiff's legal needs AS IF he had been disciplined, and then more.

Details about this assault will be provided in amendment and declaration in support of this claim.   (injuries at XIII.g, below, after XIII.2.c)

XIII 2) SECOND assault against Plaintiff:

Plaintiff was choaked by his bunk mate because

a) plaintiff refused to answer (harrassing interrogating question) what he went to the Sergeant's office for: Plaintiff was investigating SRCI/State Police not charging the attacker of assault #1 and their lies about it b) writting grievances and Kytes, and this either made anxious to these self-proclaimed rat-police & rape-avengers or they were invited/incited/agitated to harrass plaintiff (more than once they were told when someone wrote a kyte against them).

c) Choking/harrassing sex-offenders is their nature, and there's no way ODOC did not know due to their loud confessed -and proud- previous attacks. (Main agitator to the choker even has charges forgiven for assaulting an officer due to staff retaliating leaving him unconscous, matter he boasted about openly, making harrassment-by-request even more possible)

Either way, plaintiff's heavy need for answers and legal work from/against ODOC (obviously retaliative) unrequestedly moving plaintiff small person between the tallest and most openly dangerous neighbors, caused plaintiff to be choked with a hand

so big that it even covered plaintiff's mouth at the same time.

Grievance Coordinator Sobotta saw plaintiff's bleeding lip minutes later and got the full report in person.

Plaintiff was NOT moved away from these inmates after this and even ~~refused~~ declined to do so without an answer for months despite multiple requests and reports of their constant seeking excuses to do something (claim IX a and IX b).

More details will be supplied in amendment or declaration in support for this claim, including date and time of attackers confessions (regularly boosted out)

XIII 3) As a consequence of the first assault at SRCI, which EOCI's Capt. Stuart helped to keep plaintiff mis-informed, plaintiff suffered extreme internal and external pain, a broken front tooth, cut lip, permanent internal damage to organs, his now-patched tooth filling will need future replacement, maintenance or bleaching, bacteria will grow under it, chemicals will leach from it which petitioner will swallow daily for the rest of his life. The permanent pain of the first almost two months left petitioner unable to walk, alternate painful positions in bed without extra pain, unable to shower or even write his pro-se direct appeal supplemental brief without extreme pain be-cause even the weight of the arms alone depend on the abdominal muscles in pain (any weight lifting above the waist need them). Up to about 4 months, plaintiff suf-fered loss of balance, pain when walking or laughing, like the spleen hurts when walking or laughing too much, the sensation of something getting stuck in there when turning at the waist, and the swollen lip, plus the sensation of the jaw closing different, the teeth sitting different than before. (see medical form EX-HIBIT XIII 1 a)

XIII h) Plaintiff hurT his shoulder due to the unavoidable pressure of the highly violenT (fights, actually torpedo assaults, happened almost everyday aT dining rooms) gang population. Had plaintiff been sent from the The beginning to a correctional matching his <s>own</s> ^previous^ evidenT pacific personality and zero exposure to gang life, not-suited-for-physical-effort complexion, he would NOT have injured permanently his shoulder. Because of this injury, plaintiff can't lift the left arm above the shoulder level, or simply soap his chest without recoiling by the pain. ODOC doctors ensured plaintiff bone-loss was not the cause of his injury, neither was reduced joinT thickness or a spur or crack. Plaintiff concludes this is an injury due to his light frame being trained for battle beyond it was accustomed, and doctors agreed.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

~~I have filed for administrative relief as to all claims in Section III and have concluded all~~
administrative appeals available to me.

☒Yes          ☐No

## V. RELIEF

State *briefly* exactly what you want the court to do for you and the amount, if any, of monetary compensation you are seeking. Make no legal arguments. Cite no cases or statutes.

1) Summary Judgement and

2) Injunctions to STOP EOCI/DOC from doing these abuses and using these loopholes to repeate the abuse "unless we sue them"

3) Nominal & Punitive Damages and

4) Monetary Damages for all claims related to the physical injuries and risk (Assault at SRCI was covered up at EOCI) both 3 & 4 to be properly drafted by an attorney (see attached motion for appointment.)

I declare under penalty of perjury that the foregoing is true and correct.

Signed this   22   day of   February   , 20 22 .

_(Signature of Plaintiff)_

Complaint for Violation of Civil Rights (Prisoner Complaint)     page ~~28~~ ~~26~~ 27          8
[Rev. 01/2018]